**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| CARMEN DE GISI, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>ARBOR ASSOCIATES, INC.,<br><br>*Defendant.* | **CLASS ACTION**<br><br>**Case No.**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Carmen De Gisi, individually and on behalf of a class of similarly situated persons, brings this Class Action Complaint and alleges the following against defendant Arbor Associates, Inc. ("Arbor" or "Defendant"), based upon personal knowledge with respect to Plaintiff and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Arbor for its failure to properly secure Plaintiff's and Class Members' personally identifiable information ("PII") and personal health information ("PHI"). The PII and PHI may have included victims' names, contact information, ages, dates of birth, service dates, diagnosis codes, medical record numbers, names of insurers, and/or doctors' names.

2. Arbor failed to comply with industry standards to protect information systems that contain PII and PHI. Plaintiff seeks, among other things, orders requiring Arbor to fully and accurately disclose the nature of the information that has been compromised and to adopt

sufficient security practices and safeguards to prevent incidents like the disclosure (the "Data Breach") in the future.

3. Arbor has disclosed that on April 17, 2025, it "became aware of unusual network activity." Arbor further disclosed that its subsequent investigation determined that "certain files may have been acquired without authorization between April 15, 2025 and April 17, 2025."

4. Arbor subsequently disclosed to government authorities that the PII and/or PHI of at least hundreds of individuals was exposed by the Data Breach. Arbor sent out notification letters to some portion of those people, including Plaintiff, in recent weeks.

5. As a vendor serving health care providers, Arbor knowingly obtained sensitive PII and PHI and had a resulting duty to securely maintain that information in confidence. Plaintiff and Class Members would not have provided their PII and PHI to Arbor if they had known that Arbor would not ensure that it used adequate security measures.

6. Plaintiff seeks to remedy these harms individually and on behalf of all other similarly situated individuals whose PII and/or PHI were exposed in the Data Breach. Plaintiff seeks remedies including compensation for time spent responding to the Data Breach and other types of harm, free credit monitoring and identity theft insurance, and injunctive relief including substantial improvements to Arbor's data security policies and practices.

## PARTIES

7. Plaintiff Carmen De Gisi is a resident of Lafayette Hill, Pennsylvania, who received services from Arbor customer Bryn Mawr Medical Specialists Endoscopy Associates. *See* Ex. A (notice letter).

8. Defendant Arbor Associates, Inc. is a Michigan corporation, with its principal place of business in Petoskey, Michigan.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a state other than Michigan, there are more than 100 class members, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

10. This Court has personal jurisdiction over Arbor because Arbor maintains its principal place of business in Michigan and conducts substantial business in this District through its principal place of business; engaged in the conduct at issue herein from and within this District; and otherwise has substantial contacts with this District.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Arbor resides in this District, and this District and Division are where a substantial part of the acts, omissions, and events giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

### The Data Breach

12. Arbor describes itself as a "trusted partner in patient research and survey analytics for the healthcare industry."[1] Arbor claims that "[b]y hiring Arbor Associates, you gain a trusted research partner … [who will] empower you to make data-driven decisions that propel your organization forward."[2]

13. Due to the nature of the services it provides, Arbor acquires and electronically stores PII and PHI. Arbor was therefore required to ensure that PII and PHI were not disclosed or

---

[1] https://arbor-associates.com/ (last visited July 11, 2025).

[2] *Id*.

disseminated to unauthorized third parties without Plaintiff's and Class Members' express written consent.

14. On July 3, 2025, Arbor reported to the California Attorney General that a breach of its patient data occurred on April 15, 2025, which it did not discover until April 17, 2025.[3]

15. On or around July 8, 2025, Arbor reported the Data Breach to the Texas Attorney General. That report reflects that 1,524 individuals in Texas alone were affected by the Data Breach.[4]

16. Arbor's disclosures are otherwise deficient. They do not include basic details concerning the Data Breach, including, but not limited to, why PII and PHI were stored on systems without adequate security, the deficiencies in the security systems that permitted unauthorized access, whether the data was encrypted or otherwise protected, and what Arbor knows about the degree to which the data has been disseminated.

17. Arbor has not disclosed nearly all the details of the Data Breach and its investigation. Without such disclosure, questions remain as to the full extent of the Data Breach, the actual data accessed and compromised, and what measures, if any, Arbor has taken to secure the PII and PHI still in its possession. Plaintiff seeks to determine the scope of the Data Breach and the information involved, obtain relief that redresses the harm to Plaintiff's and Class Members' interests, and ensure that Arbor has proper measures in place to prevent similar incidents from occurring in the future.

---

[3] https://oag.ca.gov/ecrime/databreach/reports/sb24-604990 (last visited July 11, 2025).

[4] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited July 11, 2025).

**Arbor's Security Representations**

18. Unlike like most healthcare entities, Arbor's website makes no reference to the Health Insurance Portability and Accountability Act ("HIPAA"), and does not maintain a copy of the "Notice of Privacy Practices" that HIPAA requires all healthcare providers to make available to their patients.

19. Certain pages on Arbor's website claim that "[w]e take patient privacy very seriously at Arbor Associates. Understanding that patients may be in a very delicate state following treatment, we've taken extra care to implement safeguards within our systems to prevent any possibility of their privacy being compromised."[5]

**The Healthcare Sector is a Primary Target for Data Breaches**

20. Arbor was on notice that companies in the healthcare industry are susceptible targets for data breaches.

21. Arbor was also on notice that the Federal Bureau of Investigation has been concerned about data security in the healthcare industry. On April 8, 2014, the FBI's Cyber Division issued a Private Industry Notification to companies within the healthcare sector, stating that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs)" and pointed out that "[t]he biggest vulnerability was the perception of IT healthcare professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise." The same warning specifically

[5] *See, e.g.,* https://arbor-associates.com/hospital-cahps/ (last visited July 11, 2025).

noted that "[t]he FBI has observed malicious actors targeting healthcare-related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or PII."[6]

22. The number of reported North American data breaches increased by over 50 percent in 2021, from 1,080 in 2020[7], to 1,638 in 2021.[8] As a recent report reflects, "[h]ealthcare has increasingly become a target of run-of-the-mill hacking attacks and the more impactful ransomware campaigns."[9]

23. At the end of 2018, the healthcare sector ranked second in the number of data breaches among measured sectors, and had the highest rate of exposure for each breach.[10] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[11] Almost 50 percent of the victims lost their healthcare coverage as a result of the

---

[6] Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (Apr. 8, 2014), FBI Cyber Division Private Industry Notification (available at https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf) (last accessed July 11, 2025).

[7] *See* Verizon 2021 Data Breach Investigations Report, at 97, https://www.verizon.com/ business/resources/reports/2021-data-breach-investigations-report.pdf (last accessed July 11, 2025).

[8] *See* Verizon 2022 Data Breach Investigations Report, at 83 (available at https://www.verizon.com/ business/resources/reports/2022/dbir/2022-data-breach-investigations-report-dbir.pdf) (last accessed July 11, 2025).

[9] *Id.* at 62.

[10] *2018 End-of-Year Data Breach Report*, Identity Theft Resource Center (available at https://www.idtheftcenter.org/2018-data-breaches) (last accessed July 11, 2025).

[11] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) (available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/) (last accessed July 11, 2025).

incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[12]

24. Healthcare-related breaches have persisted because criminals see electronic patient data as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the previous 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[13] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[14]

25. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[15]

---

[12] *Id.*

[13] *2019 HIMSS Cybersecurity Survey* (available at https://www.himss.org/ sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report. pdf) (last accessed July 11, 2025).

[14] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Apr. 4, 2019 (available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks) (last accessed July 11, 2025).

[15] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019) (available at https://www.ama-assn.org/practice-

26. As major healthcare services providers, Arbor knew, or should have known, the importance of safeguarding Plaintiff's and Class Members' PII and PHI entrusted to them and of the foreseeable consequences if that data was disclosed. This includes the significant costs that would be imposed on Plaintiff and Class Members by virtue of a breach. Arbor failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

**Arbor Stores Plaintiff's and Class Members' PII and PHI**

27. Arbor obtained and stored a massive amount of PII and PHI. As a condition of engaging in health care services, Arbor and its affiliates required that patients entrust them with highly confidential PII and PHI.

28. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII and PHI, Arbor assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII and PHI from disclosure.

29. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI, and relied on Arbor to keep this information confidential and securely maintained, and to make only authorized disclosures of this information.

**PII and PHI are Valuable and Subject to Unauthorized Disclosure**

30. Arbor was aware that the PII and PHI it collected is highly sensitive and of significant value to those who would use it for wrongful purposes.

31. PII and PHI are valuable commodities to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft,

---

management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals) (last visited July 11, 2025).

and medical and financial fraud.[16] Indeed, a robust illegal market exists in which criminals openly post stolen PII and PHI on multiple underground websites, commonly referred to as the "dark web." PHI can sell for as much as $363 on the dark web, according to the Infosec Institute.[17] Moreover, "fullz" packages, which include "extra information about [a] legitimate credit card owner in case" a scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[18]

32. PHI is particularly valuable because criminals can use it to target victims with frauds and swindles that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

33. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's PHI is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial

---

[16] Federal Trade Commission, What To Know About Identity Theft (available at https://consumer.ftc.gov/articles/what-know-about-identity-theft) (last accessed July 11, 2025).

[17] Center for Internet Security, *Data Breaches: In the Healthcare Sector* (available at https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/) (last accessed July 11, 2025).

[18] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud- dark-web/ (last accessed July 11, 2025).

repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[19]

34. The ramifications of Arbor's failure to keep Plaintiff's and Class Members' PII and PHI secure are long-lasting and severe. Once PII and PHI are stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for months or even years thereafter.

35. Further, criminals often trade stolen PII and PHI for years following a breach. Cybercriminals can post stolen PII and PHI on the internet, thereby making such information publicly available.

36. Approximately 21% of victims do not realize their identity has been compromised until more than two years after it happens. [20] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[21]

37. Arbor knew, or should have known, the importance of safeguarding PII and PHI entrusted to them and of the foreseeable consequences if their data security systems were breached. This includes the significant costs that would be imposed on Plaintiff and Class

---

[19] Michael Ollove, The Rise of Medical Identity Theft in Healthcare, Kaiser Health News (Feb. 7, 2014) (available at https://khn.org/news/rise-of-indentity-theft/) (last accessed July 11, 2025).

[20] *See* Medical ID Theft Checklist (available at https://www.identityforce.com/blog/medical-id-theft-checklist-2) (last accessed July 11, 2025).

[21] Experian, The Potential Damages and Consequences of Medical Identityy Theft and Healthcare Data Breaches (available at https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf) (last accessed July 11, 2025).

Members because of a breach. Arbor failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**The Data Breach Exposed Plaintiff and Class Members to Identity Theft and Out-of-Pocket Losses**

38. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of their rights. They are incurring and will continue to incur such damages in addition to any fraudulent use of their PII and PHI.

39. Despite all the publicly available knowledge of known and foreseeable consequences of the disclosure of PII and PHI, Arbor's policies and practices with respect to maintaining the security of Plaintiff's and Class Members' PII and PHI were reckless, or at the very least, negligent.

40. In virtually all contexts, the expenditure of time has consistently been recognized as compensable, and for many people, it is the basis on which they are compensated. Plaintiff and Class Members should be compensated for the time they have expended because of Arbor's misfeasance.

41. Once PII and PHI are stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[22]

42. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer financial loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

[22] 2014 LexisNexis True Cost of Fraud Study (available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf) (last accessed July 11, 2025).

a. invasion of privacy;

b. theft of their PII and PHI;

c. lost or diminished value of their PII and PHI;

d. lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

e. loss of the benefit of their bargain;

f. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

g. statutory damages;

h. nominal damages; and

i. the continued and certainly increased risk to their PII and PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Arbor's possession and is subject to further unauthorized disclosures so long as Arbor fails to undertake appropriate and adequate measures to protect the PII and PHI.

**Arbor's Lax Security Violates HIPAA**

43. Arbor had a non-delegable duty to ensure that all PHI it collected and stored was secure.

44. Arbor is bound by HIPAA (*see* 45 C.F.R. § 160.102) and, as a result, is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

45. These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. See 45 C.F.R. § 160.103.

46. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."

47. HIPAA requires that Arbor implement appropriate safeguards for this information.

48. Despite these requirements, Arbor failed to comply with its duties under HIPAA and their own Privacy Practices. In particular, Arbor failed to:

a. maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. adequately protect Plaintiff's and Class Members' PHI;

c. ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. ensure compliance with the electronic PHI security standard rules by their workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i. train all members of their workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of their workforce to carry out their responsibilities and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b)

49. Arbor failed to comply with its duties under HIPAA despite being aware of the risks associated with unauthorized access to Plaintiff's and Class Members' PHI.

**Arbor Violated FTC Guidelines**

50. The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibited Arbor from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' PII is an "unfair practice" in violation of the FTC Act. *See, e.g., Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

51. The FTC has promulgated several guides for businesses that reflect the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[23]

52. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established data security guidelines for businesses.[24] The guidelines reflect that businesses should protect the PII that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

53. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to confidential data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[25]

54. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting

---

[23] Federal Trade Commission, Start With Security: A Guide for Business (available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) (last accessed July 11, 2025).

[24] Federal Trade Commission, Protecting Personal Information: A Guide for Business (available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf) (last accessed July 11, 2025).

[25] FTC, *Start With Security*, *supra*.

from these actions further clarify the measures businesses must take to meet their data security obligations.

55. Arbor failed to properly implement basic data security practices. Arbor's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

56. Arbor was at all times fully aware of its obligation to protect Plaintiff's and Class Members' PII and PHI because of its position as a healthcare provider. Arbor was also aware of the significant repercussions that would result from its failure to do so.

**Plaintiff's Experience**

57. Plaintiff is or was, at all relevant times, a patient at Arbor customer Bryn Mawr Medical Specialists Endoscopy Associates.

58. Upon information and belief, Arbor obtained Plaintiff's PII and PHI in the course of conducting its regular business operations.

59. At the time of the Data Breach, Arbor retained Plaintiff PII and PHI.

60. At some point after the Data Breach, one or more unauthorized persons attempted to place fraudulent charges on Plaintiff's credit card at several overseas locations. Plaintiff previously used the same credit card to pay Bryn Mawr Medical Specialists Endoscopy Associates.

61. Plaintiff greatly values his privacy and is very careful about sharing his sensitive PII and PHI. Plaintiff diligently protects his PII and PHI and takes proactive steps to ensure his PII and PHI are kept safe and secure and stores any documents containing PII and PHI in a safe

and secure location. He has never knowingly transmitted unencrypted sensitive PII or PHI over the Internet or any other unsecured source.

62. Arbor obtained and continues to maintain Plaintiff's PII and PHI and has a continuing legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

63. Plaintiff received a letter from Arbor dated July 3, 2025, over two months after the Data Breach occurred.

64. The Data Breach has caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of criminals.

65. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

66. Plaintiff has a continuing interest in ensuring that his PII and PHI, which, upon information and belief, remain backed up in Arbor's possession, are protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

67. Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of a Class as defined below:

> All persons in the United States and its territories whose PII and/or PHI was compromised in the Data Breach.

68. Excluded from the Class are Arbor, any entity in which Arbor has a controlling interest, and Arbor's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

69. Plaintiff reserves the right to modify or amend the definition of the proposed Class as additional information becomes available to Plaintiff.

70. **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. Arbor has disclosed that the Data Breach affected over 1,500 individuals in Texas alone. All Class Members' names and addresses are available from Arbor's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

71. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether and to what extent Arbor had a duty to protect the PII and PHI of Class Members;

b. Whether Arbor was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI;

c. Whether Arbor had duties not to disclose the PII and PHI of Class Members to unauthorized third parties;

d. Whether Arbor took reasonable steps and measures to safeguard Plaintiff's and Class Members' PII and PHI;

e. Whether Arbor failed to adequately safeguard the PII and PHI of Class Members;

f. Whether Arbor failed to implement and maintain reasonable security policies and practices appropriate to the nature and scope of the PII and PHI compromised in the Data Breach;

g. Whether Arbor adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI had been compromised;

h. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or punitive damages because of Arbor's wrongful conduct;

i. Whether Plaintiff and Class Members are entitled to restitution because of Arbor's wrongful conduct;

j. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm they face because of the Data Breach; and

k. Whether Plaintiff and Class Members are entitled to identity theft protection for their respective lifetimes.

72. **Typicality:** Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII and PHI, like that of every other Class Member, was disclosed by Arbor. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through Arbor's common misconduct. Plaintiff is advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no defenses that are unique to Plaintiff. Plaintiff's claims and Class Members' claims arise from the same operative facts and are based on the same legal theories.

73. **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Arbor to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in data breach litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

74. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Arbor has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Arbor's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Arbor's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

75. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Arbor. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

76. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Arbor would necessarily gain an unconscionable advantage in non-class litigation, since Arbor would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume

the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by Class Members and will establish the right of each Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

77. The litigation of Plaintiff's claims is manageable. Arbor's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with maintenance of this lawsuit as a class action.

78. Adequate notice can be given to Class Members directly using information maintained in Arbor's records.

79. Unless a class-wide injunction is issued, Arbor may continue to maintain inadequate security with respect to the PII and PHI of Class Members, Arbor may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Arbor may continue to act unlawfully as set forth in this Complaint.

80. Arbor has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

**COUNT I**
**NEGLIGENCE & NEGLIGENCE PER SE**
**(on behalf of Plaintiff and the Class)**

81. Plaintiff re-alleges and incorporates by reference herein all the allegations contained in the preceding paragraphs.

82. Arbor knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or

disclosed to unauthorized parties. That duty included, among other things, designing, maintaining, and testing Arbor's security protocols to ensure that Plaintiff's and Class Members' PII and PHI in Arbor's possession was adequately secured and protected, that Plaintiff's and Class Members' PII and PHI on Arbor's networks were not accessible to criminals without authorization, and that Arbor's employees tasked with maintaining such information were adequately trained on security measures regarding the security of Plaintiff's and Class Members' PII and PHI.

83. Plaintiff and Class Members entrusted their PII and PHI to Arbor with the understanding that Arbor would safeguard their information, use their PII and PHI for business purposes only, and not disclose their PII and PHI to unauthorized third parties.

84. Arbor knew or reasonably should have known that a failure to exercise due care in the collecting, storing, and using Plaintiff's and Class Members' PII and PHI involved an unreasonable risk of harm to Plaintiff and Class Members.

85. Arbor also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiff's and Class Members' PII and PHI.

86. A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of prior data breaches and disclosures prevalent in today's digital landscape, including the explosion of data breaches involving similarly situated healthcare providers.

87. Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Arbor knew or should have known of the inherent risks in collecting and storing Plaintiff's and Class Members' PII and PHI, the critical importance of providing adequate security of that information, the necessity for encrypting PHI

stored on Arbor's systems, and that they had inadequate IT security protocols in place to secure Plaintiff's and Class Members' PII and PHI.

88. Arbor's misconduct created a foreseeable risk of harm to Plaintiff and Class Members. Arbor's misconduct included, but was not limited to, failure to take the steps and opportunities to prevent the Data Breach as set forth herein.

89. Plaintiff and Class Members had no ability to protect their PII and PHI that was in Arbor's possession.

90. Arbor was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

91. Arbor had, and continues to have, a duty to timely disclose that Plaintiff's and Class Members' PII and PHI within their possession was compromised and precisely the type(s) of information that were compromised.

92. Arbor had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

93. Arbor systematically failed to provide adequate security for data in its possession.

94. Arbor, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII and PHI within their possession.

95. Arbor, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' PII and PHI.

96. Arbor, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the PII and PHI within Arbor's possession might have been compromised and precisely the type of information compromised.

97. Arbor's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII and PHI to be compromised.

98. But for all of Arbor's acts of negligence detailed above, including allowing cyber criminals to access its systems containing Plaintiff's and Class Members' PII and PHI, that PII and PHI would not have been compromised.

99. Plaintiff never transmitted his own unencrypted PHI over the Internet or any other unsecured source.

100. Following the Data Breach, Plaintiff's PII and PHI has been seized by unauthorized third parties who are now free to exploit and misuse that PII and PHI, and Plaintiff is unable to prevent its further dissemination. Plaintiff's PII and PHI are forever compromised.

101. But for the Data Breach, Plaintiff would not have incurred the loss and publication of his PII and PHI and other injuries.

102. There is a close causal connection between Arbor's failure to implement security measures to protect Plaintiff's and Class Members' PII and PHI and the harm suffered, or risk of imminent harm suffered by Plaintiff and Class Members. Plaintiff's and Class Members' PII and PHI was accessed and compromised as the proximate result of Arbor's failure to exercise reasonable care in safeguarding such PII and PHI by adopting, implementing, and maintaining appropriate security measures and encryption.

103. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, loss of privacy, and loss of rights. The Class is

incurring and will continue to incur such damages in addition to any fraudulent use of their PII and PHI.

104. As a result of Arbor's negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their PII and PHI, which is still in the possession of third parties, will be used for fraudulent purposes.

105. Plaintiff seeks the award of actual damages on behalf of himself and the Class.

106. Plaintiff seeks injunctive relief on behalf of the Class in the form of an order (1) compelling Arbor to institute appropriate data collection and safeguarding methods and policies with regard to patient information; and (2) compelling Arbor to provide detailed and specific disclosure of what types of PII and PHI have been compromised as a result of the Data Breach.

107. Plaintiff's and Class Members' PII and PHI constitute personal property that was stolen due to Arbor's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

108. In addition, violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

109. Section 5 of the FTC Act prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Arbor, of failing to use reasonable measures to protect PII and PHI. The FTC publications and orders described above also form part of the basis of Arbor's duty in this regard.

110. Arbor violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with applicable industry standards, as described in detail herein. Arbor's conduct was particularly unreasonable given the

nature and amount of PII and PHI it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

111. Arbor's violation of Section 5 of the FTC Act constitutes negligence *per se*.

112. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

113. The harm that occurred as a result of the Data Breach is the type of harm against which the FTC Act was intended to guard. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

114. In addition, Arbor owed a duty of care to Plaintiff and Class Members under HIPAA. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.

115. The Data Breach resulted from multiple failures by Arbor to implement adequate security, including:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards under 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1); and

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii).

116. These regulations were intended to protect Plaintiff and Class Members, and Arbor's failure to abide by them caused Plaintiff and Class Members damages.

117. Arbor's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' unencrypted PII and PHI, and Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Arbor's conduct. Plaintiff and Class Members seek damages and other relief as a result of Arbor's negligence.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiff and the Class)**

118. Plaintiff re-alleges and incorporates by reference herein all the allegations contained in the preceding paragraphs.

119. When Plaintiff and Class Members provided their PII and PHI to Arbor, they entered into implied contracts with Arbor, under which Arbor agreed to take reasonable steps to protect Plaintiff's and Class Members' PII and PHI, comply with its statutory and common law duties to protect Plaintiff's and Class Members' PII and PHI, and to timely notify them in the event of a data breach.

120. Arbor solicited and invited Plaintiff and Class Members to provide their PII and PHI as part of Arbor's provision of medical services and related services. Plaintiff and Class Members accepted Arbor's offers and provided their PII and PHI to Arbor.

121. When entering into implied contracts, Plaintiff and Class Members reasonably believed and expected that Arbor's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's and Class Members' PII and PHI and to timely notify them in the event of a data breach.

122. Arbor's implied promise to safeguard PII and PHI is evidenced by, *e.g.*, the representations in Arbor's privacy policy set forth above.

123. Plaintiff and Class Members would not have provided their PII and PHI to Arbor had they known that Arbor would not safeguard their PII and PHI, as promised, or provide timely notice of a data breach.

124. Plaintiff and Class Members fully performed their obligations under their implied contracts with Arbor.

125. Arbor breached its implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' PII and PHI and by failing to provide them with timely and accurate notice of the Data Breach.

126. The losses and damages Plaintiff and Class Members sustained, include, but are not limited to:

a. Theft of their PII and PHI;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling, and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Arbor with the mutual understanding that Arbor would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Arbor's possession and is subject to further breaches so long as Arbor fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

127. As a direct and proximate result of Arbor's breach of contract, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(on behalf of Plaintiff and the Class)**

128. Plaintiff re-alleges and incorporates by reference herein all the allegations contained in the preceding paragraphs.

129. Plaintiff and Class Members have an interest, both equitable and legal, in their PHI and PII that was conferred upon, collected by, and maintained by Arbor and that was stolen in the Data Breach.

130. Arbor benefitted from the conferral upon it of Plaintiff's and Class Members' PII and PHI, and by its ability to retain and use that information. Arbor understood that it so benefited.

131. Arbor also understood and appreciated that Plaintiff's and Class Members' PHI and PII was private and confidential and that its value depended upon Arbor maintaining its privacy and confidentiality.

132. But for Arbor's willingness and commitment to maintain its privacy and confidentiality, that PHI and PII would not have been transferred to and entrusted with Arbor. Further, if Arbor had disclosed that its data security measures were inadequate, Arbor would not have been permitted to continue in operation by regulators and the healthcare marketplace.

133. As a result of Arbor's wrongful conduct as alleged in this Complaint (including, among other things, its failure to employ adequate data security measures, its continued maintenance and use of Plaintiff's and Class Members' PII and PHI without having adequate data security measures, and its other conduct facilitating the theft of that PII and PHI), Arbor have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

134. Arbor's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compilation and use of Plaintiff's and Class Members' sensitive PHI and PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers.

135. Under the common law doctrine of unjust enrichment, it is inequitable for Arbor to be permitted to retain the benefits it received, and is still receiving, without justification, from the use of Plaintiff's and Class Members' PII and PHI in an unfair and unconscionable manner. Arbor's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

136. The benefit conferred upon, received, and enjoyed by Arbor was not conferred officiously or gratuitously, and it would be inequitable and unjust for Arbor to retain the benefit.

**COUNT IV**
**INJUNCTIVE/DECLARATORY RELIEF**
**(on behalf of Plaintiff and the Class)**

137. Plaintiff re-alleges and incorporates by reference herein all the allegations contained in the preceding paragraphs.

138. Arbor owes a duty of care to Plaintiff and Class Members requiring it to adequately secure PII and PHI.

139. Arbor still stores Plaintiff's and Class Members' PII and PHI.

140. Since the Data Breach, Arbor has announced no specific changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent similar incidents from occurring in the future.

141. Arbor has not satisfied its legal duties to Plaintiff and Class Members.

142. Actual harm has arisen in the wake of the Data Breach regarding Arbor's duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their PII and PHI, and Arbor's failure to address the security failings that led to that exposure.

143. Plaintiff, therefore, seeks a declaration that: (a) Arbor's existing security measures do not comply with its duties of care to provide adequate security; and (b) to comply with its duties of care, Arbor must implement and maintain reasonable security measures, including, but not limited to, the following:

a. ordering that Arbor engage third-party security auditors as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Arbor's systems on a periodic basis, and ordering Arbor to

promptly correct any problems or issues detected by such third-party security auditors;

b. ordering that Arbor engage third-party security auditors and internal personnel to run automated security monitoring;

c. ordering that Arbor audit, test, and train its security personnel regarding any new or modified procedures;

d. ordering that Arbor segment PHI by, among other things, creating firewalls and access controls so that if one area of Arbor's system is compromised, hackers cannot gain access to other portions of Arbor's systems;

e. ordering that Arbor purge, delete, and destroy in a reasonably secure manner PII and PHI not necessary for its provision of services;

f. ordering that Arbor conduct regular computer system scanning and security checks; and

g. ordering that Arbor routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

a. for an Order certifying the Class as defined herein, and appointing Plaintiff and his counsel to represent the Class;

b. for equitable relief enjoining Arbor from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and

Class Members' PII and PHI, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

c. for equitable relief compelling Arbor to use appropriate cybersecurity methods and policies with respect to PII and PHI collection, storage, and protection, and to disclose with specificity to Class Members the types of PII and PHI compromised;

d. for an award of damages, including actual, nominal, consequential, enhanced compensatory, and punitive damages, as allowed by law in an amount to be determined;

e. for an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. for prejudgment interest on all amounts awarded; and

g. such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 14, 2025

Respectfully submitted,

**FINK BRESSACK PLLC**

*/s/ Nathan J. Fink*
Nathan J. Fink (P75185)
38500 Woodward Avenue, Ste. 350
Bloomfield Hills, MI 48304
(248) 971-2500
nfink@finkbressack.com

**BAILEY & GLASSER LLP**
Bart D. Cohen (application for admission to be submitted)
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com